SHARON K. PALAGI, NOW KNOWN AS SHARON K. OLSON, APPELLEE, V. RONALD J. PALAGI, APPELLANT.

627 N.W.2d 765

Filed May 29, 2001.   No. A-00-634.

Steven H. Howard, of Law Offices of Ronald J. Palagi, P.C., for appellant.

Theodore J. Stouffer, of Cassem, Tierney, Adams, Gotch & Douglas, for appellee.

IRWIN, Chief Judge, and SIEVERS and INBODY, Judges.

SIEVERS, Judge.

## BACKGROUND

This litigation stems from Ronald J. Palagi's application to terminate his child support payments to his former wife, Sharon K. Palagi, prior to the time that their daughter Eva Palagi reached the age of majority under Nebraska law. Ronald and Sharon divorced in June 1988, and Sharon retained physical custody of Eva and Alicia Palagi, the couple's two daughters. Ronald was to pay child support "*'until said child attains legal age*, marries, dies, becomes self sustaining, or until further order of the court.'" (Emphasis supplied.) Ronald stopped paying child support to Sharon for Eva, born January 26, 1980, in July 1998 after Eva left for college in Lawrence, Kansas, even though she had not yet turned 19.

On July 6, 1998, Ronald filed an application to terminate his $1,000 per month child support obligation as of June 30, 1998, because thereafter Eva was attending college at the University

of Kansas in Lawrence; was not residing in Sharon's home in Bellevue, Nebraska; and had attained Kansas' age of majority. Ronald alleged in the application that he "is and will be paying for Eva Maria's tuition, board and room, etc., at the University of Kansas."

Sharon denied in her answer that Eva had left her home in Bellevue, alleging that Eva maintained her legal residence with her and that Eva lived with her when not attending the University of Kansas. As to Ronald's funding of Eva's education, Sharon stated that Eva's college expenses were "a subject of discussion and was [sic] anticipated at the time of the original Decree of Dissolution and Support in this matter and that as a result, said expenses do not constitute an unanticipated material change in circumstances."

On March 31, 2000, Ronald moved for summary judgment on his application to terminate child support. There is no ruling on the motion in the record before us, and the matter went to trial on May 5 upon stipulated facts.

In an order filed May 10, 2000, the district court for Douglas County denied Ronald's application to terminate child support, ruling that Eva was incapable of establishing a domicile in Kansas while attending the University of Kansas and that thus Nebraska's age of majority (age 19) rather than Kansas' age of majority (age 18) governed. The court also rejected Ronald's claim that he overpaid his support obligation by both paying child support and funding Eva's college education because no credit could be given for voluntary overpayments of child support under Nebraska case law.

Because Eva turned 19 on January 26, 1999, the amount in controversy in this case is limited to the support to be paid during 7 months of Eva's college career. Ronald's last child support payment to Sharon was $250, a "prorated" amount for the first week in July 1998 before Eva left for school. Therefore, the amount involved is the $1,000 per month for 7 months minus Ronald's $250 prorated payment, or a total of $6,750 in back child support Ronald has not paid.

## ASSIGNMENTS OF ERROR

Ronald asserts, summarized and restated, that the district court erred (1) in denying his application to terminate child support

and (2) in refusing to give him credit for his contribution to Eva's college education "made in lieu of child support." We do not list or discuss several assignments which are now obviously moot.

## STANDARD OF REVIEW

An appellate court has an obligation to reach an independent conclusion on questions of law. See *Gress v. Gress*, 257 Neb. 112, 596 N.W.2d 8 (1999). The facts here are essentially undisputed, and the issues are largely questions of law.

## ANALYSIS
*Does District Court for Douglas County Have Jurisdiction?*

Ronald argues that Eva established a domicile in Kansas when she moved there for college, obtained a Kansas driver's license, registered as a Kansas voter, opened a Kansas bank account, received mail in Kansas, and resided in Kansas as a full-time student throughout the fall 1998 semester. Thus, Ronald concludes that Eva, as a Kansas domiciliary, attained the age of majority under Kansas law beginning July 7, 1998. Consequently, Ronald argues in his assignments of error that the district court "erred in determining that the court had subject matter and personal jurisdiction" because Eva either was emancipated or was legally an adult in Kansas. We suggest that Ronald confuses choice of law with jurisdiction.

Ronald initiated this litigation asking for termination by a Nebraska court of his child support obligation imposed by a Nebraska court. To now argue that the district court where he brought his request does not have subject matter and personal jurisdiction seems illogical. Whether a Nebraska court has jurisdiction to terminate its own child support order is obviously a different question than whether Eva's majority is determined by Nebraska law or Kansas law. By filing the application in Nebraska, Ronald has obviously subjected himself to the court's personal jurisdiction. Neb. Rev. Stat. § 42-709 (Reissue 1998) states that Nebraska has continuing, exclusive jurisdiction over a child support order issued in Nebraska "as long as [Nebraska] remains the residence of the obligor, the individual obligee, or the child for whose benefit the support order is issued." While this statute is part of the Uniform Interstate Family Support Act

(UIFSA), Neb. Rev. Stat. § 42-701 et seq. (Reissue 1998), which we later hold to be not determinative, it nonetheless expresses the policy that Nebraska courts determine support matters when the obligor, obligee, and child are in Nebraska—which, as we discuss later, is the case here. Ronald and Sharon are Nebraska residents, and this is a Nebraska decree. Jurisdiction is present.

*What Is Applicable "Age of Majority"?*

Eva was born on January 26, 1980, making her 18 years old in July 1998. The parties stipulated that "at all times material hereto, the age of majority in the States of Kansas and Missouri was 18." We take judicial notice of other states' statutes. Neb. Rev. Stat. § 25-12,101 (Reissue 1995). The age of majority in Kansas is 18. See Kan. Stat. Ann. § 60-1610 (Reissue 1994 & Cum. Supp. 2000). The choice presented is between Nebraska's age of majority of 19 and Kansas' age of 18. Sharon asserts that the choice of which state's law governs is resolved by Neb. Rev. Stat. § 42-739 (Reissue 1998), a part of UIFSA, which provides for recognition and enforcement of support decrees in states other than where the decree was issued. Section 42-739 provides that "[t]he law of the issuing state governs the nature, extent, amount, and duration of current payments and other obligations of support and the payment of arrearages under the order." However, UIFSA applies only to registration of support orders or income withholding orders between states. UIFSA

> is designed to provide an inexpensive, simplified and effective means whereby an obligee in one state (the initiating state) can enforce the duties of support owed by an obligor in another state (the responding state) without necessarily having to leave the state, and without getting the parties involved in other complex, collateral issues.

23 Am. Jur. 2d *Desertion and Nonsupport* § 118 at 968 (1983). Here, there is only the support order issued by a district court in Nebraska, both Ronald and Sharon are in Nebraska, there are no competing or conflicting support orders, and enforcement is sought in Nebraska. Therefore, UIFSA is inapplicable.

Ronald argues that Kansas controls Eva's age of majority because the age of majority depends on where the person is domiciled and Eva was domiciled in Kansas during the pertinent

timeframe. While Ronald cites a considerable body of case law from other jurisdictions, which we have studied, we do not detail that authority for two reasons. First, none of those cases involve the precise facts presented here. Second, none tell us why we would not use Nebraska law to decide a child support dispute between two Nebraska residents arising out of a Nebraska decree. Thus, we take up the issue of Eva's domicile which is intertwined with whether she is emancipated, which if she were, would allow her to establish her own domicile in Kansas—where the age of majority is 18.

Domicile is that place where a person has his or her true, fixed, and permanent home. *Gosney v. Department of Public Welfare*, 206 Neb. 137, 291 N.W.2d 708 (1980). In order to acquire a domicile by choice, there must be a concurrence of (1) residence (physical presence) in the new locality and (2) an intention to remain there. *Id.* Act and intent must, therefore, concur, and the absence of either of these thwarts a change in domicile. *Id.*

The Nebraska Supreme Court was faced with a father's argument similar to Ronald's in *State of Iowa ex rel. Petersen v. Miner*, 226 Neb. 551, 412 N.W.2d 832 (1987). In *Miner*, a father located in Nebraska argued that Iowa's age of majority, 18 years, rather than Nebraska's age of majority applied to his support obligation for a daughter living in Iowa with her mother. Using the Revised Uniform Reciprocal Enforcement of Support Act, a precursor to UIFSA then in effect, the Nebraska Supreme Court held that the law of the responding state (Nebraska) controls with respect to the age at which a minor's custodian ceases to be entitled to child support. The essence of *Miner* was that the support act allowed the responding state to adjudicate a "duty" to support which had not been established in the initiating state's (Iowa) decree and that in such cases, the age at which the responding state ends the duty of support was controlling. But, the key fact from *Miner* is that the Iowa divorce decree mentioned the daughter, but did not make any provision for her support, allowing Nebraska to define that duty under its law. Obviously, we do not have a similar situation here, as there is a Nebraska divorce decree addressing Eva's support.

A number of other courts have held that the law of the state where the obligor resides governs. See, *In re Marriage of Lurie*, 33 Cal. App. 4th 658, 39 Cal. Rptr. 2d 835 (1995); *Ryan v. Ryan*, 128 A.D.2d 624, 513 N.Y.S.2d 25 (1987); *Danis v. Stillerman*, 66 A.D.2d 818, 411 N.Y.S.2d 353 (1978). See, generally, 23 Am. Jur. 2d *Desertion and Nonsupport* § 123 (1983). Ronald resides in Nebraska. Moreover, Nebraska has the most significant interest in, and relationship with, the obligor and obligee. This state also has a significant interest in having its law applied to its divorce decree, which still governs the matter of child support obligations between two of this state's citizens. We have trouble envisioning what interest Kansas would have in this dispute—except perhaps that we decide this under Nebraska law.

At the time Ronald and Sharon agreed to the child support terms in 1988, Nebraska's age of majority was 19, and a number of courts have declined to apply either a newly enacted age of majority or another state's age of majority to a preexisting support decree. These cases reason that at the time the support agreement was issued, the parties intended the age of majority in support orders to mean the age of majority existing when the support order originated. See, *Ruhsam v. Ruhsam*, 110 Ariz. 326, 518 P.2d 576 (1974) (support agreement obligating husband to pay child support until majority obliged husband to pay until each child reached age of 21, where parties' intent at time of signing was that "majority" meant 21, despite intervening statute reducing age of majority); *Wife, W. v. Husband, W.*, 412 A.2d 724 (Del. Fam. 1980); *Alves v. Alves*, 346 A.2d 736 (D.C. App. 1975); *Bauer v. Bauer*, 57 Ohio App. 3d 24, 566 N.E.2d 185 (1989) (where child-support obligor contends that emancipation is reached upon attainment of age of majority, it is age of majority in effect at time decree is rendered that controls that determination).

Additionally, while the UIFSA is inapplicable in this case because there are not competing state support orders, its policies regarding choice of law suggest (1) that the issuing state's substantive law (Nebraska's) concerning duration of child support obligations should govern and (2) that the age of majority is a "nonmodifiable" provision of a support order when a responding state is modifying a support order issued in another state. See *Groseth v. Groseth*, 257 Neb. 525, 600 N.W.2d 159 (1999).

See, also, Unif. Interstate Family Support Act, § 611, comment, 9 U.L.A. 428 (1999) (under UIFSA, duration of child support payments are nonmodifiable aspect of support order such that responding forum could not replace issuing state's age of majority with forum state's lower age of majority); *Holbrook v. Cummings*, 132 Md. App. 60, 750 A.2d 724 (2000) (under UIFSA, New York's age of majority (21) "trumps" that of Maryland's (18) because age of majority was nonmodifiable term of New York support order).

Nonetheless, we acknowledge that some courts conclude that the age of majority where a child is then domiciled "trumps" that of the state where the support order was issued. See, *Mims v. Mims*, 635 A.2d 320 (D.C. App. 1993) (recognizing precedent which suggests that court should apply law of children's domicile); *Alves v. Alves*, 346 A.2d at 739 ("[g]enerally, the law of the domicile regulates the status of a person as an infant and determines minority or majority"). Thus, we have come full circle back to determining where Eva was domiciled while she was a student at the University of Kansas.

■ Domicile is that place where a person has his or her true, fixed, and permanent home. *Clymer v. La Velle*, 194 Neb. 91, 230 N.W.2d 213 (1975). The habitation or residence of a minor child is, by operation of law, determined and fixed by that of the parent legally entitled to the custody and control of the child unless the parent has voluntarily surrendered such right. *Id.*

■ At common law, the domicile of a minor is the same as the domicile of the parent with whom he or she lives. *State ex rel. Frasier v. Whaley*, 194 Neb. 703, 234 N.W.2d 909 (1975). Where parents of the child are separated by a decree of divorce, the child's domicile normally follows that of the parent who has custody by virtue of the decree of divorce. *Id.*; Restatement (Second) of Conflict of Laws § 22, comment *d.* (1971). "This is true without regard to the child's physical location; that is, the domicil of an infant in the custody of a divorced mother follows that of the mother, even if the infant does not actually live with her." 25 Am. Jur. 2d *Domicil* § 42 at 34-35 (1996).

■ A minor can acquire a domicile of his or her own in limited circumstances. A minor child may acquire a domicile of

choice only if he or she is emancipated. *Russell v. State*, 62 Neb. 512, 87 N.W. 344 (1901); the Restatement, *supra*, comment *f.* Conversely, an unemancipated minor lacks the capacity to establish a domicile of choice separate from that of his parents. Annot., 44 A.L.R.3d 797 (1972). "[E]ven the attainment of majority will normally not separate an individual from the domicile of his parents if nothing has occurred to render his relationship with them, and their home, any different from that of an unemancipated minor." *Id.* at 804. Here, Eva was a minor, domiciled in Nebraska with Sharon, the custodial parent, before she left for Kansas. Thus, the only way Eva could acquire a Kansas domicile is by becoming emancipated.

Emancipation means the freeing of the child for a portion of its minority from the care, custody, control, and service of its parents. *Foxvog v. Foxvog*, 7 Neb. App. 92, 578 N.W.2d 916 (1998) (children were not financially independent and their mother made decisions on school attendance, medical needs, and where they would live). Emancipation occurs where the parent renounces all the legal duties and voluntarily surrenders all the legal rights of his or her position to the child or to others. *Id.* In determining whether a child has been emancipated, the intention of the parent governs. *Id.* A child who moves out of a custodial parent's home for a short time is not emancipated if that child continues to be supported by a parent. 24A Am. Jur. 2d *Divorce and Separation* § 1042 (1998). Moreover,

> [a] child who is attending college full-time, living with a parent during vacations and holidays, and who is employed only in the summer, is not emancipated. Likewise, a child who lives away from home but whose parents pay a substantial amount of money for medical and educational expenses and independent-living arrangements is not emancipated.

*Id.* at 441. See, also, 25 Am. Jur. 2d *Domicil* § 36 (1996) (generally, student attending school with intent to remain there only as student and until course of education is completed does not acquire domicile there); *Wulff v. Wulff*, 243 Neb. 616, 624, 500 N.W.2d 845, 851 (1993) (finding that child was not emancipated, citing evidence of child's "continuing dependence" on support of her parents).

Whether a child is emancipated is a question of fact which, although reviewed de novo on the record, will be affirmed absent an abuse of discretion. *Wulff v. Wulff, supra*. The emancipation of a child by a parent may be proved by circumstantial evidence or may be implied from the conduct of the parties. *Accent Service Co., Inc. v. Ebsen*, 209 Neb. 94, 306 N.W.2d 575 (1981). Ronald relies on the following facts contained in the stipulation to argue that Eva was emancipated: After moving into residence halls at the University of Kansas, Eva "intended to obtain Kansas residency tuition status. To accommodate this, sometime after September 1, 1998, she obtained a driver's license in Kansas, registered her personal automobile in Kansas and registered to vote in Kansas."

Nonetheless, it is clear that Eva was not emancipated when she left for Kansas in June 1998. Sharon's conduct shows that she did not voluntarily relinquish her custodial rights to Eva, nor did she abandon Eva while Eva was a student in Kansas. Eva "came home almost every weekend" between July and November 1998 according to Sharon. Sharon maintained Eva's bedroom which contained Eva's clothes and other personal belongings. Sharon stated that Eva wanted to attend the University of Kansas because, among other reasons, "[Eva] could still come home. It was close enough that she could still come home." Sharon moved to Omaha, Nebraska, in December 1998; however, she testified that Eva's "home has always been with me." Eva did not fill out a change-of-address form at the post office, and she continued to receive mail at Sharon's address in Omaha. Eva left her bedroom furniture, a majority of her clothes, shoes, books, compact discs, and stuffed animals at Sharon's. Finally, after experiencing health problems and receiving poor grades during the spring 1999 semester, Eva moved back home with Sharon in Omaha where, as of June 8, 1999, she was planning on attending the University of Nebraska at Omaha. Clearly, Eva never abandoned her home with Sharon to live independently. The facts show an 18-year-old going off to college while being primarily supported by her father and still maintaining her Omaha home with her mother. See *Orlowski v. Orlowski*, 762 S.W.2d 842 (Mo. App. 1988) (father's motion to terminate

child support based on Florida's differing age of majority denied because daughter, attending college full time in Florida and returning home on breaks, retained her mother's domicile, and therefore was not emancipated).

Eva was completely financially dependent on Sharon and Ronald. Over her first college Christmas break, Ronald bought her a new car and gave her a credit card for gas. On top of giving her a monthly $250 allowance, Ronald paid for her tuition, fees, books, room and board, car insurance and registration, medical expenses, and credit card bills while she was a student at the University of Kansas. Sharon stated that Eva did not apply for scholarships "because she thought that she had a father who was going to take care of her." In addition to Ronald's contributions, Sharon spent $625 per month on Eva's behalf while Eva was in Kansas and paid to furnish Eva's dormitory room with a television, a computer, a telephone, a refrigerator, and bedding. There is no evidence that Eva paid for anything she needed in order to live in Kansas with money she earned on her own.

Because Eva was not emancipated for the numerous reasons stated above, she did not have the capacity to acquire a Kansas domicile. As a minor child while a student in Kansas, she retained her mother's Nebraska domicile, where the age of majority was 19 years. Therefore, the district court properly denied Ronald's claim for termination of child support as of July 6, 1998. Eva was still an unemancipated minor under Nebraska law.

*Should Ronald's Voluntary Payment of College Expenses Offset Accrued Child Support Payments?*

Once Eva left for college in Kansas, Ronald paid a total of $21,527.93 on her behalf before she turned 19. Of that sum, a majority went toward Eva's tuition, fees, and books at the University of Kansas, while the remainder went to Eva in the form of a monthly allowance, payment of her charge and credit cards, medical bills, and car expenses incurred. Ronald argues that it would be inequitable if he had to pay monthly child support payments in addition to Eva's college expenses because Sharon would be "receiving" more than double recovery and the $21,527.93 in college expenses more than triples the amount he otherwise would have had to pay under the support agreement.

As Sharon correctly points out, the general rule for support overpayment claims is that no credit is given for voluntary overpayments of child support, even if they are made under a mistaken belief that they are legally required. See *Griess v. Griess*, 9 Neb. App. 105, 608 N.W.2d 217 (2000). The district court relied on this rule in denying Ronald's claim for overpayment. In *Griess*, however, we also recognized that "[e]xceptions are made to the 'no credit for voluntary overpayment rule' when the equities of the circumstances demand it and when allowing a credit will not work a hardship on the minor children." *Id.* at 115, 608 N.W.2d at 224. There is no evidence or suggestion that the resolution of this dispute will impact Eva, let alone cause her hardship. Thus, the question is whether the equities demand that Ronald be given the credit.

An appellate court reviews a trial court's exercise of equity jurisdiction de novo on the record with independent conclusions of fact and law. *Griess v. Griess, supra.* Whether overpayments of child support should be credited retroactively against child support payments in arrears is a question of law. See *id.*

In *Griess v. Griess, supra,* an obligor grossly and unwittingly overpaid child support by relying on inaccurate child support computations done by his lawyer and erroneously approved by the trial judge. Here, Ronald knowingly and voluntarily paid these additional large expenses in spite of Sharon's declination to "accept" Ronald's payments toward Eva's education in lieu of his remaining support obligation. Moreover, the record reveals that Ronald did not view paying for Eva's education a "burden," but, rather, he was predisposed all along to fund Eva's college education, just as he had for his other daughter, Alicia. While payment of college expenses is laudable and normally beyond a parent's legal obligation, we do not find any evidence that such payments were a hardship for Ronald such that the "equities demand" that he receive credit.

Ronald argues that Sharon used child support checks to fund her life with her new husband, but this claim lacks evidentiary support. The evidence was that Sharon spent a significant amount, approximately $625 per month, "on Eva's behalf" while Eva attended the University of Kansas, plus she maintained her place at home. The equities do not demand the relief Ronald seeks.

*Attorney Fees.*

Sharon has moved for attorney fees incurred on Ronald's appeal to this court and filed a supporting affidavit. We grant such motion in the amount of $2,000 taxed as costs.

## CONCLUSION

Eva was never emancipated, and her domicile remained in Nebraska where child support continues until age 19, absent emancipation. As Ronald, Sharon, and Eva were all domiciled in Nebraska, there is no doubt that Nebraska's age of majority applies such that Ronald was obligated under the support agreement to pay child support from July 6, 1998, until January 26, 1999, when Eva turned 19. Equity does not require that Ronald's significant payment for Eva's college expenses be credited against his child support. The judgment of the trial court is affirmed.

AFFIRMED.