Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/20/2021 08:07 AM CDT

Andrew K. Bowmaker, appellee, v.
Christine A. Rollman, appellant.

___ N.W.2d ___

Filed April 13, 2021.    No. A-20-466.

1. **Modification of Decree: Appeal and Error.** Modification of a dissolution decree is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record, and will be affirmed absent an abuse of discretion by the trial court.
2. **Evidence: Appeal and Error.** When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another.
3. **Contempt: Appeal and Error.** In a civil contempt proceeding where a party seeks remedial relief for an alleged violation of a court order, an appellate court employs a three-part standard of review in which (1) the trial court's resolution of issues of law is reviewed de novo, (2) the trial court's factual findings are reviewed for clear error, and (3) the trial court's determinations of whether a party is in contempt and of the sanction to be imposed are reviewed for abuse of discretion.
4. **Modification of Decree: Attorney Fees: Appeal and Error.** In an action for modification of a marital dissolution decree, the award of attorney fees is discretionary with the trial court, is reviewed de novo on the record, and will be affirmed in the absence of an abuse of discretion.
5. **Equity: Jurisdiction: Divorce: Child Support.** Jurisdiction over divorces and child support orders are within the equity powers of the district court.
6. **Courts: Equity.** Where a situation exists that is contrary to the principles of equity and which can be redressed within the scope of judicial action, a court of equity will devise a remedy to meet the situation.
7. **Modification of Decree: Child Support: Proof.** A party seeking to modify a child support order must show a material change in circumstances that (1) occurred subsequent to the entry of the original decree

or previous modification and (2) was not contemplated when the decree was entered.

8. **Modification of Decree: Child Support.** The ultimate determination of child support modification is entrusted to the trial court's discretion.

9. ____: ____. In determining whether to order a retroactive modification of child support, a court must consider the parties' status, character, situation, and attendant circumstances.

10. **Modification of Decree: Child Support: Time.** Absent equities to the contrary, modification of a child support order should be applied retroactively to the first day of the month following the filing date of the application for modification.

11. **Modification of Decree: Child Support.** In modification of child support proceedings, the children and the custodial parent should not be penalized by delay in the legal process, nor should the noncustodial parent gratuitously benefit from such delay.

12. **Child Support: Time.** There are circumstances to take into consideration wherein a noncustodial parent may not have the ability to pay retroactive support in addition to meeting current support obligations.

13. **Modification of Decree: Time: Appeal and Error.** The initial determination regarding the retroactive application of a modification order is entrusted to the discretion of the trial court and will be affirmed on appeal absent an abuse of discretion.

14. **Divorce: Child Support.** Child support payments become a vested right of the payee in a dissolution action as they accrue.

15. **Judgments: Child Support: Proof.** Although a court may not forgive or modify past-due child support, a court may, on motion and satisfactory proof that a judgment has been paid or satisfied in whole or in part by the act of the parties thereto, order it discharged and canceled of record, to the extent of the payment or satisfaction.

16. **Child Support.** The general rule for support overpayment claims is that no credit is given for voluntary overpayments of child support, even if they are made under a mistaken belief that they are legally required.

17. **Equity: Child Support.** Exceptions are made to the rule that no credit is given for voluntary overpayment of child support when the equities of the circumstances demand it and when allowing a credit will not work a hardship on the minor children.

18. **Child Support.** Whether overpayments of child support should be credited retroactively against child support payments in arrears is a question of law.

19. **Appeal and Error.** An appellate court has an obligation to reach an independent conclusion on questions of law.

20. **Divorce: Attorney Fees.** In awarding attorney fees in a dissolution action, a court shall consider the nature of the case, the amount

involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of the questions raised, and the customary charges of the bar for similar services.

Appeal from the District Court for Douglas County: PETER C. BATAILLON, Judge. Affirmed.

Justin A. Roberts, of Lustgarten & Roberts, P.C., L.L.O., for appellant.

John F. Eker III and Barbara J. Prince for appellee.

RIEDMANN, BISHOP, and WELCH, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Christine A. Rollman (Christine) appeals an order of the Douglas County District Court modifying a Kansas decree which dissolved her marriage to Andrew K. Bowmaker (Andrew). She claims several errors in the district court's handling of matters related to Andrew's child support obligations, including the court's determination that an extrajudicial agreement between the parties precluded finding Andrew in contempt for alleged child support arrearages. She also challenges the denial of her request for attorney fees. We affirm.

## II. BACKGROUND

### 1. KANSAS DECREE AND
### NUNC PRO TUNC ORDER

Christine and Andrew were married on December 12, 2006. Their son was born in 2008. On September 3, 2013, they dissolved their marriage through a "Decree of Divorce (With Children)" entered in the district court for Riley County, Kansas. The decree refers to a May 30, 2013, "Marital Settlement Agreement" (marital agreement) "marked as Exhibit 1." The marital agreement was reviewed and approved by the court. The decree also referred to a parenting plan, which the court approved and made part of the decree. Upon

Christine's motion, the Kansas court entered an "Order Nunc Pro Tunc" on November 11, 2018, correcting alleged erroneous designations of the parties in the original decree to reflect the rights and obligations of Christine and Andrew. The nunc pro tunc order referred to the marital agreement signed on May 30, 2013, and filed on June 20, which was subsequently ratified and confirmed by entry of the September 3 decree. The court proceeded to identify the errors in that agreement and the decree and modified both documents accordingly.

As relevant to this appeal, the Kansas court's initial decree and marital agreement, along with the modifications made by the nunc pro tunc order, required Andrew to pay the following: $250 per month in child support beginning on September 1, 2013; "a portion equal to [his] percentage of combined income of any required deductible amount, necessary medical, or dental expenses of the [parties' son] that are not covered by such [health, dental, or hospitalization] insurance"; and "100% of any secondary educational tuition and/or related expenses for the [parties' son]." Both the marital agreement and nunc pro tunc order specifically provided that Andrew would not be responsible for "any child care and related expenses above and beyond the standard monthly child support obligation." Our record does not include any child support worksheet or other document indicating the parties' combined income at the time of the Kansas orders. Christine had already moved from Kansas at the time of the initial decree, and after other moves, she ultimately resided in Gretna, Nebraska, in October 2016. Andrew also moved to Nebraska in 2016, at some point after October.

## 2. Nebraska Proceedings

Christine registered the Kansas decree and nunc pro tunc order in Nebraska on January 17, 2019; the marital agreement was not included in that filing. She then filed a complaint to modify and an application for contempt on February 26. In her complaint to modify, she alleged that a material change in circumstances had occurred requiring modification of the

parties' child support obligations under the registered decree. In her contempt pleading, she alleged that Andrew had failed to pay child support without justification and owed her "the sum of $16,000 through January 1, 2019."

(a) Trial Commences February 14, 2020

Trial commenced on February 14, 2020, and at the onset, the district court noted for the record that the court "had a long discussion with the attorneys . . . regarding the issues in this case" and that the parties reached an agreement as to certain matters. An agreed-upon parenting plan and a child support calculation were received as evidence. It was agreed the incomes reflected in the child support calculation would be used, but that values for retirement plans attributed to the parties had to be deleted and the calculation revised. Christine was to carry health insurance for their son, and as for noncovered medical expenses, Christine would pay the first $250 per calendar year, after which the parties would split the noncovered medical costs based on their percentages under a revised child support calculation. Those same percentages would be used for dividing childcare expenses. The parties also agreed to equally split their son's private school tuition costs through the eighth grade. The court orally approved the parties' agreement and parenting plan. At the conclusion of this hearing, the court noted that the issues remaining were "what, if anything, the [child support] arrearage is, whether there should be . . . retroactive child support and what that should be, and then if attorney[] fees" should be awarded. Andrew's attorney then raised the issue of alternating the tax exemption for the parties' son as set forth in the decree, but which Christine had claimed every year. The court deferred that issue until after a determination was made as to arrearages.

(b) Continuation of Trial and
Motion to Set Aside Agreement

Trial continued on February 26, 2020. Christine and Andrew offered their testimony and other exhibits relating to

financial matters to address the remaining issues. Trial had to be continued again to complete Andrew's testimony and was ultimately rescheduled for June 2. On May 29, prior to the June 2 hearing, Andrew filed a motion to set aside the agreed-upon parenting plan and a notice that he was "no longer willing to have his child support based on" the income set forth in the agreement approved by the district court on February 14. At the June 2 hearing, further testimony and evidence relating to Andrew's financial situation and relationship with the parties' son was adduced, which we will set forth more fully later in this opinion.

(c) District Court's Announcement
of Decision and Order

On June 12, 2020, the parties returned for the district court's announcement of its decision. The court found there had been no "material change of circumstances as to the agreement with regard to the parenting plan." As for child support, the court concluded there had been a material change of circumstances since trial commenced. It noted that "obviously, because of the COVID-19 issues there has been a material change of circumstances with regard to [Andrew's] child support obligation." "As such, the Court is going to allow [Christine] if she wants to do additional discovery as to [Andrew's] income." The court informed Christine's attorney that he could continue the matter for additional evidence. Meanwhile, the court was imputing an income of $65,000 per year to Andrew for child support purposes, and it ordered the revised child support to be effective as of March 1. Further, the court announced that there were "no child support arrears. The parties had an agreement." The court pointed out the parties' agreement that in lieu of child support, Andrew would pay Christine "the tuition and whatever else request that was made by [Christine], which could be for health reasons, for additional money, things of that nature." The court announced that Andrew would be allowed to claim the tax exemption for the parties' son for the 2020 and 2021

tax years and odd-numbered years thereafter. The court indicated that it was "leaving the record open" and that it was up to Christine's counsel whether additional discovery was needed as to Andrew's income. "So the child support is temporary at this time unless you guys agree to it [being] permanent. If you can't agree to [it being] permanent, then we'll set another trial date as to the child support." Christine's lawyer indicated he needed to discuss that with Christine.

On June 17, 2020, the district court entered an "Order of Modification" consistent with the findings announced from the bench on June 12. The court again noted that Christine "was not provided enough notice with regard to the Motion to Set Aside" and granted her "leave to conduct additional discovery regarding [Andrew's] income." The court ordered Andrew to pay $631 per month in child support retroactive to March 1. Andrew was also ordered to pay 56 percent of daycare expenses, 56 percent of noncovered medical expenses after Christine paid the first $250 of such expenses, and 50 percent of "any private school tuition fees incurred on behalf of the [parties' son] through the eighth grade." Andrew was granted the right to claim the tax exemption for the parties' son on his returns for the tax years 2020 and 2021 and each odd-numbered year thereafter. The court further dismissed the contempt matter, finding there to be "no child support arrearage" because Christine and Andrew "had a private agreement regarding [Andrew's] payment of child support to [Christine]." The court did not award attorney fees to either party. All other terms from the original decree not specifically modified by the court's order remained in full force and effect.

Christine timely appealed.

### III. ASSIGNMENTS OF ERROR

Christine claims, condensed and restated, that the district court erred in (1) setting aside the parties' agreements regarding child support and tax exemptions; (2) making Andrew's

retroactive child support effective March 1, 2020, rather than 1 year earlier; (3) finding no child support arrearage, as a result of the parties' extrajudicial agreement regarding child support, and thus dismissing the contempt action; and (4) failing to award Christine attorney fees.

We note, however, that Christine does not specifically argue any error regarding the district court's allocation of tax exemptions, and we therefore decline to address it. See *Dycus v. Dycus*, 307 Neb. 426, 949 N.W.2d 357 (2020) (to be considered by appellate court, party asserting alleged error must both specifically assign and specifically argue it).

## IV. STANDARD OF REVIEW

[1,2] Modification of a dissolution decree is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record, and will be affirmed absent an abuse of discretion by the trial court. *Tilson v. Tilson*, 307 Neb. 275, 948 N.W.2d 768 (2020). When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

[3] In a civil contempt proceeding where a party seeks remedial relief for an alleged violation of a court order, an appellate court employs a three-part standard of review in which (1) the trial court's resolution of issues of law is reviewed de novo, (2) the trial court's factual findings are reviewed for clear error, and (3) the trial court's determinations of whether a party is in contempt and of the sanction to be imposed are reviewed for abuse of discretion. *McCullough v. McCullough*, 299 Neb. 719, 910 N.W.2d 515 (2018).

[4] In an action for modification of a marital dissolution decree, the award of attorney fees is discretionary with the trial court, is reviewed de novo on the record, and will be affirmed in the absence of an abuse of discretion. *Garza v. Garza*, 288 Neb. 213, 846 N.W.2d 626 (2014).

## V. ANALYSIS

### 1. Prospective Child Support Agreement

Christine contends the district court abused its discretion in setting aside the parties' agreement related to income figures to be used for calculating child support. That agreement was approved by the district court on February 14, 2020, prior to the continuation of trial. The agreement provided that for the purpose of calculating Andrew's child support obligation, Andrew was agreeing to be imputed an income of $8,333 per month or approximately $100,000 per year because of his earning history, even though his present annual salary was $65,000. Based upon this figure, Andrew's child support payments were calculated to be $872 per month. In his testimony given on February 26, Andrew affirmed that this amount matched his understanding of the agreement.

Then, on May 29, 2020, Andrew moved the court to set aside this agreement, just before the continuation of trial scheduled for June 2. He asked the court to take into consideration the "significant downturn in his business and his income." He requested that his child support obligation be based on his yearly salary of $65,000, rather than the imputed $100,000 annual income agreed upon previously.

Prior to when Andrew started a business with his brother-in-law in December 2019, the joint tax returns of Andrew and his current wife showed a combined gross income of $123,867 for 2017 and $121,380 for 2018. Andrew did not provide a tax return for 2019 or other tax documentation, stating that his accountant had his W-2 wage and tax statement and that he was "waiting for a K-1 from 2019" in order to complete his 2019 tax return. Andrew testified his annual income was approximately $105,000 at the time Christine filed her complaint to modify in February 2019. However, he was laid off later that year in September or October, and was unemployed until December, when he and his brother-in-law started a business, Summit Metal Recycling Inc. (Summit). As joint owners, Andrew and his brother-in-law had the authority to

divide the corporation's profits. The only salaried employees of Summit were Andrew and his current wife. The statements of earnings provided to the district court initially reflected an annual salary of $100,000 in January 2020, but beginning in February, his income was adjusted to reflect an annual salary of $65,000. Despite this reduction, Andrew agreed to have his income imputed at $100,000 per year "because of the history of having a job working $100,000 and just trying to do the right thing."

However, upon continuation of trial, Andrew subsequently testified that the coronavirus pandemic severely impacted his business, saying that "[t]he Coronavirus has basically wiped out [his] customer base." He stated that his wife was no longer working as an employee of Summit because he "couldn't afford her anymore" despite receipt of $147,000 from his brother-in-law as an investment in the corporation. He also received a loan of $33,000 from the "payroll protection" program established by the "CARE[S] Act" after his wife was furloughed to cover payroll expenses. Even with these loans, Andrew affirmed that he was "struggling to pay" his $65,000 salary. With respect to Summit's finances, Andrew offered a profit-and-loss statement reflecting the monthly profits and losses of Summit through May 2020. This statement indicated that from January through May, Summit experienced a net loss of $107,169.91, although we note a total of $35,000 in expenses classified as "Owner Distribution."

Christine asserts the district court abused its discretion in setting aside the agreement the parties had reached at the beginning of trial which established the figures to be used in the calculation of Andrew's child support obligation. She argues in part that "setting aside agreements made on the record in the middle of a trial is contrary to the public policy on settlements." Brief for appellant at 25. It is true that our public policy favors the settlement and compromise of disputes. See *Holoubek v. Romshek*, 16 Neb. App. 677, 749 N.W.2d 901 (2008). There is no dispute the parties came to

an agreement, orally approved by the district court on the first day of trial, regarding the parenting plan and the figures to be used in calculating Andrew's child support obligation. The record also plainly demonstrates the parties agreed the only disputes remaining after that same hearing were "the possibility of retroactive child support, the arrearages with regard to the contempt on child support, and attorney[] fees." Andrew's dispute over his imputed income also came well after the district court entered its scheduling order.

[5,6] However, despite the court's initial approval of the parties' agreement, the court did not enter an order incorporating the income figures into the calculation of child support, because the trial was continued for further hearing. Proceedings were still ongoing at the time Andrew filed his notice on May 29, 2020, and the final trial date did not take place until June 2. With the case still pending, it remained in the court's equitable power to consider the unexpected financial circumstances caused by the coronavirus pandemic when deciding whether or not to set aside the parties' earlier agreement. See *Drennen v. Drennen*, 229 Neb. 204, 426 N.W.2d 252 (1988) (jurisdiction over divorces and child support orders within equity powers of district court). And "[w]here a situation exists that is contrary to the principles of equity and which can be redressed within the scope of judicial action, a court of equity will devise a remedy to meet the situation." *Yori v. Helms*, 307 Neb. 375, 387, 949 N.W.2d 325, 336 (2020). We find no abuse of discretion in the court's remedy here, which was its decision to set aside the parties' earlier agreement regarding Andrew's imputed income due to the unusual intervening circumstances and evidence brought to the court's attention before the case was fully submitted.

Christine claims, however, that equity requires enforcement of the agreement, as Andrew provided very little notice and "it would simply waste the money the parties spent on their attorneys to secure those agreements" over the "one year and four months" Christine has waited "to see the benefit of her

bargain." Brief for appellant at 30. She argues that setting aside the agreed upon child support figures caused her inequity through her being "'blindsided'" by Andrew's dispute and being denied "the benefit of her bargain" paid for by her time and attorney fees. *Id*. While we can appreciate her argument, we cannot ignore or discount the unforeseeable impact the coronavirus pandemic has caused throughout 2020 and into the present. At the time of the parties' agreement in February 2020, the true extent of the coronavirus' economic effects on businesses was neither fully known nor anticipated. In addition, to balance out Andrew's late dispute over his imputed income, the district court provided Christine leave to pursue additional discovery regarding Andrew's finances and ordered the child support award to be "temporary . . . unless [she] agree[d] to it permanent[ly]." Christine chose not to pursue that option, electing instead to accept and directly appeal the district court's order. We do not see the court's decision to set aside the agreement and give Christine leave to conduct additional discovery to be, as Christine characterizes it, an invitation "for endless litigation on matters that had been resolved before the trial . . . even began." *Id.* Rather, the court's decision recognized the extraordinary circumstances that materialized over the course of this action and attempted to balance the equities accordingly. In light of the coronavirus pandemic and the options for further discovery made available to Christine, the district court's decision not to enforce the parties' earlier agreement did not cause inequity to Christine.

[7,8] While Christine contests the district court's characterization of the coronavirus pandemic as an independent material change in circumstances to set aside the agreement, we note this characterization was not necessary. A party seeking to modify a child support order must show a material change in circumstances that (1) occurred subsequent to the entry of the original decree or previous modification and (2) was not contemplated when the decree was entered. *Tilson v. Tilson*,

307 Neb. 275, 948 N.W.2d 768 (2020). Both Christine and Andrew have agreed that a material change in circumstances occurred to justify the district court's modification of the original decree, and the district court found the same. However, the ultimate determination of child support modification is entrusted to the trial court's discretion. See *Windham v. Kroll*, 307 Neb. 947, 951 N.W.2d 744 (2020).

Christine also asserts that the evidence and testimony offered by Andrew regarding his income and the financial health of Summit "should be viewed with some suspicion." Brief for appellant at 33. She contends "[t]here was no credible evidence" regarding Andrew's financial situation or the effect of the coronavirus pandemic on his downturn in business to justify the district court's decision to set aside the figures for child support agreed to by the parties. *Id*. at 34. Andrew testified that his salary was $65,000 per year at the time of the parties' agreement in February 2020, but that he agreed to have his income imputed at $100,000 because he hoped to return to that level of income. However, his statements of income indicate his monthly income remained consistent with an annual salary of $65,000 through May 2020. Additionally, the profit-and-loss statement shows that in the first 5 months of 2020, Summit sustained a profit of $48,887.20 in January, a loss of $159,069.28 in February, a loss of $4,844.90 in March, a profit of $16,013.22 in April, and a loss of $8,156.15 in May. These figures totaled a net loss of $107,169.91. Christine further points out that Summit's "Payroll Expense is already $53,916.68 through May 29, 2020," despite the fact that Andrew is the only employee after he furloughed his wife earlier in 2020. Brief for appellant at 33. The profit-and-loss statement also indicates expenses labeled "Cash In" totaling $8,800 and "Owner Distribution" of $5,000 and $10,000 in April and May 2020. Christine highlights that "simple math dictates that there would have been a profit [in May 2020] had there not been an owner distribution of $10,000.00." *Id.* at 34.

We note that many of the issues raised by Christine stem from Andrew's changed position regarding his imputed income and Christine's subsequent election to accept the district court's order as final to pursue this appeal rather than engage in further discovery. Christine did not question Andrew for explanations of the discrepancies she now identifies on appeal or the extent of the coronavirus pandemic's effect on Summit's scrap metal business; nor did she seek any of Summit's balance sheets, bank account statements, or other documentation of Summit's financial health after the district court granted leave for additional discovery. As we have already described, these matters were open to further exploration and examination through the court's decision to grant Christine leave to conduct additional discovery.

The record before us reflects an essentially unchallenged presentation of evidence regarding Andrew's finances, although Christine now uses this appeal to highlight the incompleteness of the record and inconsistencies in that evidence. We are mindful that where the evidence is in conflict, an appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. See *Tilson v. Tilson*, 307 Neb. 275, 948 N.W.2d 768 (2020). Here, the trial court accepted Andrew's evidence and found him credible. Despite being given the opportunity to do so, Christine neither challenged that evidence at trial nor pursued additional discovery to contest Andrew's characterization of Summit's financial health. Given these circumstances, we find the district court did not abuse its discretion in ordering Andrew's income to reflect an annual salary of $65,000.

## 2. Retroactive Child Support

Christine also claims on appeal that the district court abused its discretion in setting Andrew's retroactive child support to be effective as of March 1, 2020, rather than a year earlier, following the filing of her complaint to modify in February 2019.

[9-13] In determining whether to order a retroactive modification of child support, a court must consider the parties' status, character, situation, and attendant circumstances. *Johnson v. Johnson*, 290 Neb. 838, 862 N.W.2d 740 (2015). Absent equities to the contrary, modification of a child support order should be applied retroactively to the first day of the month following the filing day of the application for modification. *Id.* Generally, the children and the custodial parent should not be penalized by delay in the legal process, nor should the noncustodial parent gratuitously benefit from such delay. See *id.* However, there are circumstances to take into consideration wherein the noncustodial parent may not have the ability to pay retroactive support in addition to meeting current support obligations. *Roberts v. Roberts*, 25 Neb. App. 192, 903 N.W.2d 267 (2017). The initial determination regarding the retroactive application of a modification order is entrusted to the discretion of the trial court and will be affirmed on appeal absent an abuse of discretion. *Id.*

Christine claims the district court abused its discretion because Andrew failed to prove he was unable to pay the modified child support retroactively to March 2019. She asserts that Andrew "did not give credible testimony," brief for appellant at 35, and "refused to provide any documentation to verify he could not pay retroactive child support and still meet his current obligations," specifically identifying that Andrew "never showed any documents to verify that he lost 30 percent to one-third of his income" and "refused to provide income tax information," *id.* at 36. She argues that the district court erred when it "took his word at face value, even though his testimony was proven incorrect." *Id.*

We have previously described Andrew's testimony and the evidence regarding his income and Summit's financial health. As noted previously, the district court found Andrew's testimony and evidence to be credible concerning his ability to pay retroactive child support. Based on the record before us, and giving weight to the fact that the trial court heard and

observed the witnesses, we cannot say the court abused its discretion in setting Andrew's modified child support obligation to commence on March 1, 2020.

### 3. Child Support Arrearage

Christine contends the district court erred when it found Andrew not to be in contempt due to Andrew's payment of certain expenses in lieu of child support pursuant to an extrajudicial agreement between Christine and Andrew.

In a civil contempt proceeding where a party seeks remedial relief for an alleged violation of a court order, an appellate court employs a three-part standard of review in which (1) the trial court's resolution of issues of law is reviewed de novo, (2) the trial court's factual findings are reviewed for clear error, and (3) the trial court's determinations of whether a party is in contempt and of the sanction to be imposed are reviewed for abuse of discretion. *McCullough v. McCullough*, 299 Neb. 719, 910 N.W.2d 515 (2018). Accordingly, we will first consider whether the parties' agreement for payments in lieu of child support was legally permissible, thus allowing credits against the child support owed. We will then consider whether any of the district court's factual findings related to the credits were clearly erroneous. Finally, we will consider whether the court abused its discretion when it concluded Andrew was not in contempt and dismissed the contempt action.

### (a) Payments for Expenses in
### Lieu of Child Support

[14,15] As a precursor to our analysis, we are mindful that child support payments become a vested right of the payee in a dissolution action as they accrue. See *Ybarra v. Ybarra*, 28 Neb. App. 216, 943 N.W.2d 447 (2020). Also, a court may not forgive or modify past-due child support. *Dartmann v. Dartmann*, 14 Neb. App. 864, 717 N.W.2d 519 (2006). However, a district court may, on motion and satisfactory proof that a judgment has been paid or satisfied in whole or in

part by the act of the parties thereto, order it discharged and canceled of record, to the extent of the payment of satisfaction. *Id*. However, in this case, Andrew did not motion the district court to discharge his child support obligation under the Kansas decree, and the district court did not order that obligation discharged. The issue of Andrew's arrearages was raised by Christine's contempt action, and the district court's order solely concerned whether or not Andrew was in contempt of his obligation under the Kansas decree. Our review is likewise limited to whether the district court abused its discretion in dismissing the contempt matter.

[16-19] In considering the question of contempt, we address whether the voluntary payments made by Andrew outside the terms of the Kansas court's orders can be credited against Andrew's child support obligation. Nebraska courts have allowed the granting of a credit against child support arrearages in certain circumstances. See, e.g., *Berg v. Berg*, 238 Neb. 527, 471 N.W.2d 435 (1991) (affirming credit given against father's child support arrearage for period when father had two of four children in his possession and continued paying mother full child support amount); *Speicher v. Speicher*, 6 Neb. App. 439, 572 N.W.2d 804 (1998) (affirming trial court's order offsetting father's child support arrearage with his interest in marital home). A voluntary overpayment of child support occurs when a party pays above and beyond what is required by a child support order. In Nebraska, the general rule for support overpayment claims is that no credit is given for voluntary overpayments of child support, even if they are made under a mistaken belief that they are legally required. *Jameson v. Jameson*, 13 Neb. App. 703, 700 N.W.2d 638 (2005). See, also, *Johnson v. Johnson*, 290 Neb. 838, 862 N.W.2d 740 (2015); *Palagi v. Palagi*, 10 Neb. App. 231, 627 N.W.2d 765 (2001). However, exceptions to this general rule are made when the equities of the circumstances demand it and when allowing a credit will not work a hardship on the minor children. See *Jameson v. Jameson, supra.* Whether overpayments

of child support should be credited retroactively against child support payments in arrears is a question of law. *Palagi v. Palagi, supra*. An appellate court has an obligation to reach an independent conclusion on questions of law. *Id.*

We conclude that the equities of the present case demand allowing certain credits for Andrew's payments and that allowing such credits will not work a hardship on the parties' son, the one minor child in this case. Notably, Andrew did not unilaterally modify the Kansas court's order; rather, the parties mutually agreed to Andrew's payment of expenses in lieu of child support payments. The district court determined there was no arrearage in child support because "the parties had a private agreement regarding [Andrew's] payment of child support to [Christine]." In finding no arrearages, the court described that Andrew "was supposed to pay the tuition and whatever [other] request that was made by [Christine], which could be for health reasons, for additional money, things of that nature."

Of significance, the record before us includes a copy of a bankruptcy petition filed by Christine in 2017 and accompanying schedules dated in August of that year. This petition, signed by Christine, included the following declaration:

> [Christine] is entitled to receive $250.00/month in child support per her divorce decree. However, [Christine] states that in lieu of paying child support, her ex-husband contributes to half of their son's medical, school tuition, and childcare expenses. [Christine] states that she is not owed any arrearages based on this agreement.

An attached schedule to the bankruptcy petition estimated that Andrew paid approximately $300 per month. At trial, Christine characterized this agreement as an "understanding" that "happened . . . over time." She claimed that she and Andrew never "truly said, like, in lieu of [child support,] . . . [b]ut that's what it turned into." She affirmed that she understood these payments to be in lieu of child support and believed Andrew to understand the same. Several exhibits evidenced direct

payments made by Andrew to Christine through other means, including by cash, check, and online payments.

As described previously, the Kansas decree and subsequent order nunc pro tunc required Andrew to pay $250 per month in child support through the Kansas child support payment center. He was also to pay "a portion equal to [his] percentage of combined income of any required deductible amount, necessary medical, or dental expenses of the [parties' son] that are not covered by . . . insurance[,]" and "100% of any secondary educational tuition and/or related expenses for the [parties' son]." The order did not impose an obligation on Andrew for primary school tuition or daycare expenses, yet he contributed to these and other expenses upon Christine's request. Christine primarily contests the crediting of private school tuition and medical costs against Andrew's child support obligation.

### (i) Private School Tuition Expenses

Christine contends that it was the parties' mutual decision that their son should attend a private school and that therefore, allowing Andrew to be credited for his half of tuition payments caused "the tuition costs, in effect, [to fall] 100 percent on" her. Brief for appellant at 38. She asserts that the tuition payments should be treated as voluntary overpayments of child support and that no credit should be given against Andrew's child support obligation for his half of their son's tuition.

We note that this court has previously rejected a father's request for a credit against his child support for his payments toward his daughter's university expenses. See *Palagi v. Palagi*, 10 Neb. App. 231, 627 N.W.2d 765 (2001). In doing so, this court found the father "knowingly and voluntarily paid these additional large expenses in spite of [the mother's] declination to 'accept'" the payments in lieu of child support. *Id.* at 242, 627 N.W.2d at 774. Further, we described the father as "predisposed all along to fund [his daughter's] education." *Id.* Christine suggests that the "rule in *Palagi* should be applied

to the case at bar, because the parties made a joint decision to enroll [their son] in a private school with tuition expenses." Brief for appellant at 39. However, we find the existence of the parties' agreement that Andrew would pay tuition, along with other expenses paid in lieu of child support which he was not court ordered to pay, distinguishes this case from *Palagi v. Palagi, supra*. The equities in this case favor the allowance of a credit for the tuition payments against Andrew's child support obligation.

### (ii) Medical Expenses

As for Andrew's contribution to medical expenses in the amount of $1,075.87, we agree with Christine that the original Kansas decree obligated Andrew to pay some percentage of uncovered medical expenses and that "obligation . . . is separate and in-addition-to the child support obligation." Brief for appellant at 38. Since Andrew was obligated under the Kansas decree to pay for such expenses in addition to child support, any payments made for such expenses should be disregarded in determining credits for child support. To the extent Andrew may have underpaid or overpaid his share of such expenses based upon his percentage of the parties' combined income, we are unable to consider the same, since our record does not include any figures concerning the parties' combined income at the time of the Kansas decree. We conclude these payments should not be credited against Andrew's child support obligation.

### (iii) Other Payments

Regarding all other payments, the record provides little description of their intended purpose or eventual use. Christine indicated in her testimony that Andrew would pay her varying amounts at different times after the entry of the Kansas decree, lower than the required $250 per month. She described that Andrew would pay a share of certain other bills and expenses, such as daycare, while also occasionally giving her cash when

she requested. With the same considerations in mind as we have previously described, we find that to any extent these payments constituted overpayments of child support, Andrew should be credited for these payments as well.

### (b) Factual Determinations
### Related to Credits

At $250 per month, Andrew's obligation under the original child support order totaled $19,500 when accounting for the 78 months from September 2013, when the Kansas decree was entered, until March 1, 2020, when the modified child support became effective. At trial, Christine offered a certified copy of the records maintained at the Kansas child support payment center that indicated Andrew made no payment of child support through that payment center. In finding no arrearages, the district court described that Andrew "was supposed to pay the tuition and whatever [other] request that was made by [Christine], which could be for health reasons, for additional money, things of that nature." As discussed previously, to the extent the district court's reference to "health reasons" included medical payments made by Andrew in its consideration of credits against child support, it was error to do so.

A spreadsheet summarizing Andrew's direct payments to Christine from September 3, 2013, through June 29, 2019, totaled $13,887.44. Included in these payments were $1,075.87 paid by Andrew for half of their son's uncovered medical expenses and $4,080 for half of his private primary school tuition. In addition to these payments, Christine and Andrew testified that Andrew at times made cash payments to Christine, although Christine conceded that she did not "know how much [Andrew] paid [her] in cash." Our record includes an estimation providing that from September 2013 until an unspecified month in 2019, Andrew paid approximately $3,300 to Christine in cash. In addition to this cash amount, the estimation includes an asserted $500 credit for 2 months in

2019 when the parties' son lived with Andrew; the document reflects a sum totaling $3,800. Finally, beginning August 4, 2019, and continuing through February 9, 2020, Andrew made direct online payments to Christine totaling $2,550. Combined, Andrew paid Christine approximately $20,237.44 from September 2013 until March 1, 2020. When subtracting out the $1,075.87 paid for medical expenses, Andrew paid Christine approximately $19,161.57 for their son's expenses in lieu of child support.

### (c) Contempt

We turn now to the question of whether the district court abused its discretion by finding Andrew was not in contempt of the parties' decree and in dismissing the contempt matter against him. Accounting for credits permitted, we have determined that Andrew paid $19,161.57 in various expenses that the district court could properly credit against Andrew's child support obligation of $19,500, which would have accrued from September 1, 2013, until March 1, 2020. Deducting Andrew's payments from the child support obligation results in a deficit of $338.43.

Here, as we have previously noted, we are determining only whether the district court abused its discretion in concluding Andrew was not in contempt of court related to his child support obligation under the Kansas decree. Therefore, in addition to our own math calculation set forth above, we are also mindful that as of August 2017, Christine averred in her bankruptcy documents that no child support arrearage existed at that point in time. So, when considering the timeframe from September 2017 until March 1, 2020 (30 months), child support of $7,500 would have accrued under the Kansas decree. Undisputed evidence shows Andrew paid $7,826.98 to Christine during that timeframe. Accordingly, we cannot say the district court abused its discretion in concluding Andrew was not in contempt of the Kansas court's child support order and in dismissing Christine's contempt action.

### 4. Attorney Fees

Christine asserts that the district court abused its discretion in not awarding her attorney fees.

[20] In an action for modification of a marital dissolution decree, the award of attorney fees is discretionary with the trial court and will be affirmed in the absence of an abuse of discretion. See *Garza v. Garza*, 288 Neb. 213, 846 N.W.2d 626 (2014). It has been held that in awarding attorney fees in a dissolution action, a court shall consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of the questions asked, and the customary charges of the bar for similar services. *Id.*

Christine argues that Andrew "treated [her] unfairly and inequitably during the proceedings" when he "failed to respond to certain discovery requests" yet was "permitted to testify about his reasons that he should not pay retroactive child support and a possible arrearage." Brief for appellant at 43. She claims that this permitted Andrew to "unfairly surprise [her] with his testimony and documents" while "the issues became moving targets." *Id.* She further highlights the difference in income and earning capacity between herself and Andrew. Christine offered an affidavit as to her outstanding attorney fees, indicating that she incurred $9,383.05 in fees for trial preparation and would incur additional fees for trial.

As set forth above, we did not find inequity in the district court's handling of the issues regarding Andrew's income and general financial health. The economic effects of the coronavirus pandemic provided sufficient justification for the district court to reopen the calculation of Andrew's child support obligation. The court granted Christine leave to conduct further investigation into Andrew's claim about the adverse financial impact of the coronavirus pandemic; however, Christine elected to pursue this appeal instead. Based on the record

before us, we cannot say the district court abused its discretion in not awarding Christine attorney fees in this case.

## VI. CONCLUSION

Although we conclude the district court erred to the extent it may have included Andrew's payment of medical expenses for the parties' son in its consideration of credits to be applied to Andrew's child support obligation, we nevertheless find the record supports the court's ultimate conclusion that no child support arrearage existed based upon the parties' private agreement. Therefore, the court did not abuse its discretion in finding Andrew was not in contempt of the Kansas court's child support order and in dismissing the contempt action. We also find no error in the court's decision related to child support prospectively and retroactively, nor in its decision declining to award attorney fees to either party. The district court's June 17, 2020, modification order is affirmed.

Affirmed.